ST. PAUL, M. & M. RY. CO. v. WESTERN UNION TEL. CO. et al. WESTERN UNION TEL. CO. v. ST. PAUL, M. & M. RY. CO. et al. NORTHWESTERN TEL. CO. v. SAME.

(Circuit Court, D. Minnesota, Third Division. December 22, 1900.)

TELEGRAPHS—CONTRACTS BETWEEN TELEGRAPH AND RAILROAD COMPANIES—CONSTRUCTION.

A railroad company granted to certain individuals an exclusive right of way to construct and operate for general business purposes a telegraph line upon the right of way of its contemplated road and extensions thereof. The contract contained no limit as to time, but provided for the payment of certain sums by the company for the construction of the line, and for its use by the respective parties. The contract was transferred by the grantees to a telegraph company, which constructed the line. Subsequently complainant railroad company became the owner of the railroad property under a foreclosure of mortgages executed after the telegraph contract, which decree preserved the rights of the grantees therein. Pending the foreclosure the telegraph company had made considerable extensions of its lines, covering extensions of the road made by the receiver, under an agreement with the receiver as to their construction and operation. Complainant entered into a new contract with the telegraph company, confirming that made by the receiver, providing for subsequent extensions over future extensions of the road, the terms of construction and operation, and providing for a readjustment of such terms at stated periods thereafter. This contract contained no limit as to time. Thereafter the telegraph company leased all its lines and property for 99 years to the Western Union Company, subject to all its contracts, and for a substantial consideration, in the assumption and payment by the lessee of the interest and principal of the lessor's mortgage and the payment of dividends on its stock. The lease required the lessee to keep up the property and surrender the same in good condition at the end of the term. Complainant recognized the lease, and made a new contract with the lessee, changing the terms on which future extensions were to be made and the lines operated as between the parties; granting to the lessee

exclusive right of way for such extensions, and requiring it to bear the entire cost of construction. This contract provided that it should continue for 10 years, and should supersede all other agreements between the parties or their respective predecessors. During the term of this contract large extensions were made of the railroad, and the telegraph lines were correspondingly extended; and at the end of the term complainant claimed that all the rights of both the telegraph companies terminated, and that it became the owner of all lines of telegraph constructed on and attached to its right of way. *Held*, that the contract could not be so construed, but, under the circumstances, and in view of the agreements by the lessee, it must be construed as relating only to matters between the parties which were wholly executory, such as the terms of future construction and operation of the lines during the 10 years, and not to rights of property therein, and that, moreover, the lessor company acquired vested property rights by the original grant of right of way to its predecessor, and the construction of its lines thereunder, which could not be affected by any contract made by its lessee.

### In Equity.

The bill in this case was filed by the St. Paul, Minneapolis & Manitoba Railway Company to have adjudicated its title to all the telegraph lines and property situated upon the line of its railway. It alleged the ownership of the right of way upon which these lines were situated; that these lines had been constructed under certain contracts, the terms of which had expired; and that the lines were affixed to the soil, and were therefore the property of the railway company. The telegraph companies, defendants, denied the contentions of the railway company, and insisted that, in view of the provisions of the contracts under which the lines had been constructed, the legislation of the state of Minnesota, and of certain acts of congress, the telegraph lines were the property of the telegraph companies, and, even although the terms of certain contracts had expired, yet that the telegraph companies had the legal right to maintain and operate, as telegraph properties, these telegraph lines where they were located.

In 1863 the St. Paul & Pacific Railroad Company, as a corporation of Minnesota, was endeavoring to construct a line of railroad from St. Paul to Watab, and to secure the benefits of a land grant given by congress to Minnesota, dated March 3, 1857, entitled "An act making a grant of land to the territory of Minnesota in alternate sections, to aid in the construction of certain railroads in that territory, and granting public lands in alternate sections to the state of Alabama, to aid in the construction of a certain railroad in said state." The St. Paul & Pacific Railroad Company entered into a contract with A. B. Smith and Z. G. Simmons for the construction of a telegraph line along its railway from St. Paul to Watab, and upon extensions and continuations of said line, agreeing to pay a certain sum to Smith & Simmons for the construction of the line, and to give them, for the uses and purposes of the contract, the exclusive right of way for the lines of telegraph upon the lands of the railway company. This contract was without limit as to time, and in January, 1865, was transferred to the Northwestern Telegraph Company, which built some lines under this contract. In 1874 the St. Paul & Pacific Railroad Company became involved in financial difficulties, and certain foreclosure proceedings were begun in both the federal and state courts for the foreclosure of mortgages executed subsequently to the contract with Smith & Simmons. In the foreclosure proceedings pending in the United States court, one Farley was appointed receiver, and on the 16th of April, 1878, in the name of the St. Paul & Pacific Railroad Company, entered into another contract with the Northwestern Telegraph Company, which, without referring to the contract with Smith & Simmons, changed many of the provisions relating to the division of cost of construction of the new telegraph lines, and also the extent of the uses of the lines by the respective parties when constructed. Like the contract with Smith & Simmons, this contract was without limit as to time, and also granted to the telegraph company a right of way along the line of the railroads of the railway company for the construction and use of tele-

graph lines for commercial or public uses and business. It also provided that the telegraph lines covered by the contract should form a part of the general system of the telegraph company. After the making of the Farley contract in 1878, the foreclosure proceedings were terminated in both the state and the United States courts, and the complainant, the St. Paul, Minneapolis & Manitoba Railway Company, was incorporated. It was formed by the purchasers of the railway property under an act passed by the legislature of Minnesota, approved March 6, 1876, and in its act of incorporation specified that it became the owner of said property subject to the prior liens referred to in the decrees of foreclosure, and in the deeds of the sheriff and master in the several courts. The Northwestern Telegraph Company was not a party to any of the foreclosure proceedings, and in the decrees of foreclosure there was an express reservation "that the rights and property of any person, persons, or co-partnerships in and to any warehouse, side track, or other structure erected on the right of way on said line of railroad shall be, and thereby are, saved, preserved, and protected, so as to save, preserve, and protect the equitable rights of all parties interested."

After the organization of the St. Paul, Minneapolis & Manitoba Railway Company, and its acquisition of the entire railway property formerly belonging to the St. Paul & Pacific Railroad Company, on the 15th day of October, 1879, the St. Paul, Minneapolis & Manitoba Railway Company entered into a contract with the Northwestern Telegraph Company which was a reaffirmation of the Farley contract of 1878. By it the telegraph company was to construct a line of telegraph along the line of the railroad as constructed, and along all future extensions as fast as the same should be constructed. The uses of the line, when constructed, were divided between the two parties as specified in the contract. The railway company agreed to pay the telegraph company one-half the cost of this construction, and to give to the telegraph company a right of way along the line of the railroads of the railway company for the construction and use of telegraph lines for commercial business or public uses and business. It was further provided that the telegraph lines, the construction of which was provided for in the contract, should form part of the general system of the telegraph company. There was a provision that at any time after ten years from the date of the contract, and at the expiration of every five years thereafter, either of the parties should have the right to require a reconsideration and readjustment of the terms of the contract, so as to relieve either from unreasonable or unnecessary burdens. This contract was not limited in point of time. Under this contract the Northwestern Telegraph Company constructed a considerable amount of new telegraph line as the railway was constructed, and reconstructed lines constructed under the former contracts. On the 7th day of May, 1881, the Northwestern Telegraph Company leased all its system of telegraph lines to the Western Union Telegraph Company for the term of 99 years. In this lease it gave the Western Union Telegraph Company full power to manage and operate its telegraph lines, and assigned to it all contracts with railway companies for the purposes of the lease. The Western Union agreed to maintain the properties, to carry out the contracts with railway companies, and in case of default or forfeiture to return the property, together with all additions thereto, and at the termination of the lease agreed to return the property received in good condition for business. On the 1st of July, 1881, the Western Union, as lessee, entered into possession of this property, and gave notice to the officers of the St. Paul, Minneapolis & Manitoba Railway Company of the lease, and directed that all accounts of business at offices on the lines of the railway company be returned to the superintendent of the Western Union Telegraph Company, instead of, as formerly, to the superintendent of the Northwestern Telegraph Company. This request was acquiesced in by the railway officials, and thereafter the Western Union Telegraph Company was requested from time to time to carry out the provisions of the contract of October 15, 1879. Some new lines were constructed, and the property was operated by the Western Union Telegraph Company and the railway company under the contract of October 15, 1879.

In 1882 a contract dated August 23, 1882, but taking effect July 1, 1882, was entered into between the Western Union Telegraph Company and the

St. Paul, Minneapolis & Manitoba Railway Company. The recitals to this contract were: "Whereas, the parties hereto jointly own certain lines of telegraph along the various railroads of the railway company, being the existing lines of telegraph now in operation along the railway company's lines of railroad, and which lines are now operated under the provisions of a contract dated October 15th, 1879, between the Northwestern Telegraph Company and the St. Paul, Minneapolis & Manitoba Railway Company, which contract has been duly transferred to the telegraph company, the said lines of telegraph in which the railway company has a joint ownership being shown in a schedule marked 'A,' and hereto annexed; and whereas, the railway company has constructed certain extensions of its railroad, upon which extensions it desires telegraph lines constructed, and both parties hereto desiring and requesting the modification and cancellation of said contract hereinbefore mentioned: Now, therefore," etc. The twelfth provision of this contract was: "The provisions of this contract shall supersede said contract hereinbefore mentioned and all other agreements between the parties hereto or their respective predecessors, and shall extend to all roads now or hereafter owned or controlled by the railway company while this contract remains in force." By the ninth clause of this contract: "The railway company, as far as it legally may, subject to the laws of the state of Minnesota and of the United States, and the provisions of its charter, hereby grants and agrees to assure to the telegraph company, during the existence of this contract, the exclusive right of way on, along, upon, or under the line, lands, and bridges of the railway company, upon and along its right of way, and on any extension and branches thereof, for the construction and use of lines of poles and wires," etc. It was further provided that "this contract shall be in force and take effect on the 1st day of July, 1882, and shall continue in force for the term of ten years thereafter." This contract changed the provisions of the prior contract, in that it required the telegraph company, at its own expense, to construct all the lines of telegraph and all extensions, and to give to the railway company the use of as many wires as the railway company required in its business. There were other changes in the methods of operating the lines, which are immaterial in this connection. Upon the termination of the 10 years named in the contract of July 1, 1882,—the last contract above named,—the railway company claimed that the contract of July 1, 1882, entirely superseded and annulled all former contracts, and that the telegraph lines which had been constructed thereunder were an annexation to the freehold of the railway company, and as such were the property of the railway company. This contention was denied by the telegraph companies, which claimed that the contract of July 1, 1882, was simply a modification of the working arrangements of the prior contracts, and that the rights of property in the telegraph lines were unaffected by the contract of July 1, 1882; that the lines were the property of the telegraph companies, with certain rights of use in them secured to the railway company. Cross bills were filed by both the Western Union Telegraph Company and the Northwestern Telegraph Company, asking for an accounting, and setting up the rights to the maintenance and operation of these telegraph lines under the act of congress of July 24, 1866, even if the contracts named had all been abrogated and annulled.

M. D. Grover and George B. Young, for complainant.

John F. Dillon, Rush Taggart, C. M. Ferguson, and George H. Fearons, for defendant Western Union Tel. Co.

Ripley & Lum, for defendant Northwestern Tel. Co.

LOCHREN, District Judge (orally). This is an important case, involving a large amount of property and valuable interests. I should be glad, if I had the time, to take the case under advisement, and examine the contracts carefully, and the evidence, and the cases which have been referred to by counsel, and those on their briefs which for

want of time have not been referred to in the argument. But the pressure of business upon me is such that I cannot, in justice to other matters, give to the case the time I would be glad to give to it. I apprehend there is less necessity for this, because, on account of the large interests involved, my decision will doubtless be reviewed by judges who will have the time to give it more careful consideration. I can say, however, that the case has been carefully and fully argued by counsel,—able counsel on both sides; and I am, perhaps, as well able to determine it now as I shall be if I give to it further time.

The question is as to which company is at the present time the owner of the telegraph system and appliances, including the telegraph right of way along the railway of the complainant company in the state of Minnesota, and westward to the Pacific Coast. And this depends mainly upon the contracts which have been produced in evidence. There is considerable testimony in the case, I judge, from the printed books, which has not been brought to my attention, very likely because it is deemed immaterial, or that the facts which are proven by the evidence have ceased to be matters of dispute between counsel. The complainant's rights relate back to the rights derived from the land grant act of congress of March 3, 1857, and the act of the legislature of the state of Minnesota incorporating the Minnesota & Pacific Railroad Company, which gave it a part of that land grant. The name of that railroad was subsequently changed to the St. Paul & Pacific Railroad Company, and somewhere about the year 1864 the First Division of the St. Paul & Pacific Company was formed; and through a mortgage made by one of the two last-named companies, and its foreclosure, the title of the railroad company and its franchises passed to the present complainant. These charter provisions gave the railway company not only the power to build and operate a railroad, but also to build and maintain a telegraph along the railway line. The telegraph had become well known to be an appliance as necessary for the operation of a railroad and the transaction of railroad business with safety to passengers, and with safety as regards the appliances and rolling stock of the railroad itself, as any other construction connected with a railroad. I have no doubt that the authority to build and operate a railroad would authorize the railroad company to construct a telegraph, to insure safety in its operation, and do any business which would be for the convenience of the public by the use of such telegraph; and it might transmit commercial messages or private messages, and would not be confined simply to railroad business, even if there were no express authority given. The authority to construct and build a telegraph line, expressly given, as in this instance, would include the authority to use it for all purposes that were not unlawful, and especially for all purposes convenient to the public and to the transaction of business generally. I have no doubt, either, that, under the authority to build and maintain a telegraph, it would have the right to contract with another party or corporation authorized to construct telegraph lines, if it saw fit to do so; and, as far as defendant's duty to maintain such telegraph is con-

cerned, that could be performed by and through another corporation authorized to build and operate the telegraph.

Now, it appears by the testimony that on September 21, 1863, and before any railroad was built in the state,—at any rate, any railroad of the predecessor of this company (and I think the predecessor of this complainant built the first railroad that was built in the state),—a contract was made between Smith & Simmons and the St. Paul & Pacific Railroad Company by which Smith & Simmons agreed to build a telegraph line from St. Paul to Watab, upon terms which are described in that contract. There is no need of referring to all of its provisions. It required the payment of a certain amount per mile by the railroad company, and there was an agreement with reference to the free transportation of material and the persons constructing the telegraph lines, and the free use of the telegraph by the railroad company to carry messages, and also a grant of the right of way to Smith & Simmons upon the line described, for the uses and purposes of the line of telegraph; and in the eleventh paragraph there is a further provision that as the St. Paul & Pacific Railroad Company shall further extend, construct, and operate its said road, the said Smith & Simmons may and shall continue the same line of telegraph along the extended lines of said road upon the same terms and conditions as thereinbefore mentioned. It seems to me that this is a grant of a perpetual easement or right to establish, construct, and continue in the operation of a line of telegraph along the line specified in the contract, and along such further lines of railroad as shall be constructed by the St. Paul & Pacific Railroad Company, and that it became a vested property right at that time. It is not, perhaps, necessary to refer to the contract that was made between Farley, as receiver, and the Northwestern Telegraph Company. It appears that prior to the time of that contract Smith & Simmons, or at least Simmons and persons named therein as successors to Smith, by a somewhat informal writing assumed to transfer all the interest of Smith & Simmons in that contract to the Northwestern Telegraph Company. The Northwestern Company had a line of telegraph constructed between St. Paul and Watab, or between St. Paul and St. Cloud, prior to the time of the commencement of the foreclosure of the railway company's mortgage, in which foreclosure Farley was appointed receiver. How much more was then constructed, I do not know, but it extended as far as the railroad was then built. It was stated by Judge Young in his argument that the pleadings in the case admit that all of this construction of telegraph was done, up to July 1, 1882, under the contract called "Contract A," of October 15, 1879. But it appears that there was this line of telegraph in operation on all extensions of the railroad prior to the contract entered into by Mr. Farley with the Northwestern Telegraph Company on April 16, 1878, which contract has been read in evidence, and was acted upon during the administration of Mr. Farley, during which time a considerable portion of the line was built from some point near Breckenridge to St. Vincent, in order to save the land grant, for reasons explained in the argument. A line of telegraph was also constructed by the Northwestern Company

at the same time along this new extension of the railway by the receiver, and operated by the Northwestern Company under the Farley contract. It seems to me that the right of way for the telegraph along this extension constructed by Farley was conveyed before to the predecessors of the Northwestern Company in the Smith & Simmons contract, for reasons which I will refer to later.

On October 15, 1879, after the formation of the Manitoba Company, the present complainant, a contract was entered into between that company and the Northwestern Telegraph Company, which then operated and claimed to own the telegraph lines as far as they were constructed, which contract provided the terms on which that operation should be carried on, and in respect to the further expense of construction, and of the maintenance of the lines; and the contract itself assumed to grant the right of way. It says "that said telegraph company shall have the right of way on and along the line of the railroads of the said railway company for the construction and use of telegraph lines for commercial business or public uses and business"; and the railway company covenants that it will not transport upon its railroads any men or material for competing lines, except at the usual rates. Although that clause does not employ the technical language that is ordinarily used in a deed of land, or in a grant of any easement of land, still the language used, if fairly interpreted, conveys this easement. It does not fix any future time when it shall go into operation, and, although the words used are in the future tense, still it seems to me it would take effect immediately, in the nearest instant of the future after it was executed. But that language does not appear to me to be more than a further assurance of the title that the Northwestern Telegraph Company had already obtained through the Smith & Simmons contract. Without reference to whether the right of way was conveyed in a formal manner in this contract of October 15, 1879, it was conveyed in such a manner as to show that the other party to the contract, the Manitoba Company, which had succeeded to the rights of the St. Paul & Pacific Company, recognized the Northwestern Telegraph Company, as authorized to build, maintain, and operate those lines of telegraph. The grant of the right of way for lines of telegraph by the St. Paul & Pacific Railroad Company to Smith & Simmons by the seventh and eleventh paragraphs of the contract of September 21, 1863, was a then present and vested grant, covering not only the line then particularly described, but equally the right of way along the railways thereafter to be built by that company. This grant was effective, although the locations in the future would be fixed definitely by the locations of the railroad. All this grant of right of way was prior to the mortgage, and not disturbed by the foreclosure, to which neither Smith & Simmons nor the Northwestern Telegraph Company were parties; and these rights appear to have been recognized by the court and the receiver during the foreclosure, and by the Manitoba Company immediately afterwards and thenceforward. And while there might have been a right on the part of Smith & Simmons, or whoever represented them, to question the informal transfer to the Northwestern Company, I think, after such a recognition by the Manitoba Company, and expenditures by build-

ing and maintenance of the lines of telegraph by the Northwestern Company, that, as long as no one else questioned the right of the Northwestern Telegraph Company to build and operate these lines, the railroad company could not question its rights.

Afterwards, and while this Contract A, of October 15, 1879, was in operation, the lease was made by the Northwestern Company to the other defendant here, the Western Union Telegraph Company, dated May 7, 1881. Now, that instrument, on its face, purports to be a lease. It does not purport to be a sale of the property. It has all the attributes of a lease. It has a termination. It provides at the end of the term for the return of the property, having at the same time a provision that the property shall be kept up and that the contracts shall be carried out (the contracts being transferred for the purpose of being carried out), and also that the improvements and replacements shall remain during the term of the lease, and the property returned in as good condition at the end of the lease as at the time the demise took effect. It is made upon a valuable consideration,—indeed, a large and ample consideration. When we consider the mortgage which the lessee was required to take care of, as far as interest upon the bonds was concerned, and the dividends to be paid to the stockholders during the term, and the final payment of the principal of the mortgage debt, there was a large amount of continued periodical payments to be made upon this lease, with the right of re-entry in case of default. Now, whether the Northwestern Telegraph Company had the right to assign its contracts with the railroad company or not, the lease and the assignment of the contracts came to the knowledge of the complainant here, the Manitoba Company, and it dealt with the Western Union Telegraph Company as entitled to the rights and bound by the obligations of the Northwestern Company. It required the Western Union Telegraph Company, under the contract that it then had with the Northwestern Telegraph Company, to go on and build telegraph lines on the new railroad extensions; and it proceeded to deal with it in all respects as the lessee of that company, or at least as having authority to manage the constructed lines, and build and manage, as far as new lines were concerned, the lines of telegraph along this railway, as far as the railroad had been built or was being extended. That was the condition of things up to the time when the contract of July 1, 1882, was entered into; and one principal question in the case is, what was the effect of that contract? The claim on the part of the complainant is that it was substituted instead of the previous contracts,—expressly substituted instead of the contract immediately preceding it, of October 15, 1879, and also, in general terms, instead of all the previous contracts with the telegraph company or any of its predecessors.

What was the effect of that contract, supposing such to be its purport, is one serious question now to be determined. If the effect of the contract of July 1, 1882, was to leave the defendant, the telegraph company, without any property or rights at the expiration of the 10 years, it would seem to be a hard contract. It would leave the Western Union Company still saddled with its obligations to the Northwestern Company to pay the accruing interest on the mortgage

bonds, and the bonds at maturity, and the stipulated dividends to stockholders, and return the leased property to the lessor, with all additions, at the end of the term of 99 years, and compel the Western Union Company during the term of 10 years to build at its own sole cost telegraph lines along all extensions of the railroad, a large amount of which was actually built but a very short time before the expiration of the term, when, according to the claim of the complainant, all the telegraph property would pass immediately to the complainant, by reason of the lapse of these contracts, and of the rights of the telegraph company under them, at the end of the 10 years. But supposing that on July 1, 1882, instead of entering into the contract of that date, the parties had simply, by a writing under seal of the two companies, abrogated all contracts between the parties, and entered into no new or further contract, what would be the condition in which that would leave each of these parties in respect to the right of property in these telegraph lines? Would they immediately pass to the railroad company, or would the telegraph company remain the owner of the lines? The lines were built by the telegraph company, or by its lessors; and the railroad company had, perhaps, some rights in respect to wires strung by it for its separate use under the contracts. The telegraph lines were built upon the right of way which was granted by the railroad company and its predecessors to the predecessors of the telegraph company. That right of way is an interest in land. Abrogating the contracts would not be a reconveyance of the title which had been granted to the telegraph companies. It seems to me that the only effect of such abrogation would be to put an end to the particular stipulations in relation to repairs and to the cost of construction of new telegraph lines, and in relation to the use of the telegraph as between the companies. The railroad would be no longer obliged to carry free the material or the men required for the building of the telegraph lines, or to supply labor in the repair of them, and the telegraph company would be no longer obliged to send messages free for the railroad company. None of those executory provisions would remain obligatory after the contract was abrogated. But the abrogation of the contract would not affect the provisions which had been executed, and which had already vested property rights in the one party or the other. So that my impression is that it would leave the ownership of the right of way of the telegraph lines in the telegraph companies. It does not matter whether the title would be in the Northwestern Company or the Western Union Company, as there is no contest between those two companies. Besides, the Western Union Company could not by any contract affect the property rights of its lessors, the Northwestern Company. It does not seem to me, therefore, that I need consider the effect of the acts of congress with respect to the rights of the railway and telegraph companies,—neither the act of July 24, 1866, nor any other of the acts of congress referred to on the argument. The case may be disposed of simply upon the contracts between the parties themselves.

This contract of July 1, 1882, while it purports to supersede all previous contracts, and cancel especially the contract of October 15, 1879, does not seem to contain any provision that can affect the rights

of property as they were vested at that time, and before that last contract was entered into. There is no conveyance, and there is no provision that there shall be any change of title or possession at the end of the 10-year term. There is a provision which grants the telegraph company during the existence of that contract for those 10 years an exclusive right of way on, along, and upon or under lines and bridges of the railway, and on any extensions or branches thereof, during that 10-year term; but that does not seem to be inconsistent with the fact that it had a right of way before, or that its lessor had a right of way not exclusive before. This grant is something additional and not inconsistent with the other, and, as both would be for the benefit of the grantee, it would be presumed that it would retain both of them. There is nowhere in that contract any provision that at the end of 10 years the telegraph company shall abandon the line of telegraph or its use, or turn over the possession of it to the railway company. Now, looking at that contract carefully, it seems to me that it only abrogated the operating and executory provisions of the previous contracts; and that must be its only effect, unless it operates as a conveyance of property rights, and that it does not do. There are no words in it from which any such intention can be inferred, nor can it be from anything that appears outside of the contract. When we consider the situation of the parties and their interests, there appears to be nothing either in the language of the contract or in the surrounding circumstances from which that intention can be inferred; and, as I said before, there is no provision that at the end of the term the existing rights of property shall not continue. This particular contract authorizes the building of extensions and the operation of the same by the telegraph company like the telegraph lines before constructed, and as part of the general system of the telegraph company. Considerable changes are made in its provisions from those contained in the previous contracts as to many other matters. This contract gives the railroad company the right to use the entire telegraph system of the Western Union Company,—a system which extends, according to the statement of counsel, throughout all the states, or, at any rate, far beyond the limits of these telegraph lines that were being built in connection with this railroad. It relieves the railroad company from paying half of the cost or expenses of building the extensions of the lines of telegraph that were to be constructed. So this contract for its term of 10 years, while it contains some conditions that are more favorable to the telegraph company than those contained in the previous contract, leads me to think that the changes are far more considerably in favor of the railroad company than of the telegraph company, and that it contains nothing that can be regarded as a consideration for the giving up or the abandonment of this valuable property. The facts that under the last contract the telegraph lines were operated substantially as before, while the entire cost of all new construction was to be borne by the telegraph company, and that the contract contains no language from which the intention now claimed by the complainant can be inferred, lead me to the conclusion that the telegraph companies still own the telegraph property the same as they did before the contract was made, and have

the same interests in that property which they had at any prior time, and the railroad company has the same interests therein which it had before that contract was made, and no greater.

A decree may be drawn to conform with the conclusions indicated. This seems to have been an amicable action, commenced with the consent of all the parties, and for the purpose of determining the rights of the parties; and therefore it is an action in which no costs should be allowed. I think that perhaps I have said enough to enable counsel to draw the proper decree in the case. Its terms, if not agreed to, may be settled upon two days' notice.